U.S. COURTS

99 DEC 17 AM 9: 04

REC'D_____ FILED_____
CAMERON S. BURKE
CLERK          IDAHO

KENNETH D. NYMAN
NYMAN & THOMAS
802 W. Bannock St., Ste 900
Boise, Idaho 83702
(208) 336-3250

FEE PAID
RCPT # _1325_

CHRIST T. TROUPIS
TROUPIS LAW OFFICE
1406 E. First St. Ste 101
P.O. Box 1367
Meridian, Idaho 83680

Attorneys for UNITED MINING CORPORATION

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED MINING CORPORATION )<br><br>Plaintiff, )<br><br>vs )<br><br>BRUCE M. BABBIT, JR., Secretary )<br>of the Interior of the United States , )<br>UNITED STATES DEPARTMENT )<br>OF THE INTERIOR; IDAHO STATE )<br>OFFICE, UNITED STATES )<br>DEPARTMENT OF THE INTERIOR, )<br>BUREAU OF LAND MANAGEMENT, )<br><br>Defendants ) | Case No. **CIV 99 - 0 5 9 4 - S - MHW**<br><br>**COMPLAINT** |

COMES NOW Plaintiff, UNITED MINING CORPORATION, and for its cause of

action and claim for relief against the Defendants, and each of them, alleges as follows:

COMPLAINT – 1

## JURISDICTION

1. This Court has jurisdiction of the matter under and pursuant to 28 U.S.C. Sec. 1331, in that the action arises under the laws of the United States; under and pursuant to 28 U.S.C. Sec. 1346, in that the United States, or its departments or agencies, are named Defendants herein; and under and pursuant to 28 U.S.C. Sec. 1361, in that this action seeks relief in the nature of an order of mandamus to compel officers and agencies of the United States to perform duties owed to the Plaintiff.

## PARTIES

2. Plaintiff, United Mining Corporation ("United Mining"), is an Idaho corporation which located and owns certain mining claims, known as "the KB claims", which are located along the Big Wood River Channel near Shoshone, Idaho situated within Sections 3, 10, 11, 14, and 15, T. 4 S., R. 18 E., Boise Meridian ("the KB claims).

3. At all times material hereto, Defendant Bruce M. Babbitt, Jr., was and is the duly appointed and acting Secretary of the Interior of the United States. The Bureau of Land Management ("BLM") is a section of the Department of the Interior, and all references herein to the BLM refer to Defendant Department of the Interior acting at the direction of Defendant Bruce Babbitt.

## GENERAL ALLEGATIONS

4. Although the BLM had for several decades examined the general area in which the KB claims are located, it did not deem the water-worn boulders in the Big Wood River Channel as valuable, and made no attempt to protect those boulders from appropriation under the public land laws, prior to the location of those claims by Plaintiff.

COMPLAINT – 2

5. In 1992, an employee of Plaintiff United Mining Corporation who was looking for landscaping rocks discovered water-worn boulders in the area near the KB claims. The BLM suggested that a "community pit" be established for the sale of the boulders, and BLM's appraisers concluded that the "highest and best use" of the area was, indeed, the removal of stone.

6. While United Mining was waiting for the BLM to complete the paperwork necessary to establish a community pit, it discovered that the BLM had determined that the boulders were "locatable minerals," as distinguished from salable or leasable minerals, and had allowed one of United Mining's competitors to locate mining claims for similar boulders on a nearby stretch of the Big Wood River Channel.

7. Plaintiff located the 14 KB claims on or about February 4 and 5, 1992, and filed the location notices for the claims with the BLM on April 23, 1992.

8. In the meantime, unbeknownst to Plaintiff, some employees of the BLM had decided that the boulders in the stretch of the Big Wood River Channel which now contains the KB claims were so strikingly beautiful that they now merited consideration for withdrawal from mineral entry altogether, and preservation as a Wilderness.

9. There has never been any dispute that the KB claims contain valuable locatable minerals which can be profitably extracted, and that the claims were properly located on BLM land which was available for mineral entry at the time of location. The BLM nevertheless issued a "Prohibition of Mining" with respect to the KB claims, pending a hearing on whether the land covered by the claims is a "Great Natural Wonder," which renders them non-locatable under the mining laws. A true and accurate copy of that Decision is attached hereto, marked Exhibit A,

COMPLAINT – 3

and incorporated herein by this reference.  Defendant has and continues to prohibit Plaintiff from conducting mining operations and from removing minerals from the claims.

10.  The Federal Land Policy and Management Act of 1976 ("FLPMA") allows the Department of the Interior to withdraw public lands from mineral entry for the purpose of preserving wilderness values, but only if it follows certain specific administrative procedures, including notice, public hearing and the opportunity for administrative and legislative overview. Section 204(a) of FLPMA [43 U.S.C. ¶1714(a)] specifically provides that:

> [T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section.

11.  In this case, the Department of the Interior essentially ruled that, despite the statutory mandate, whenever lands merit withdrawal as a wilderness, the Department may at its option either take administrative action as required by the statutory procedure (FLPMA and the Wilderness Act), or simply deem that a withdrawal has automatically occurred without notice or action by the Department on the grounds that the public lands in question constitute a "Great Natural Wonder".

12.  On November 1, 1994, the Department of the Interior obtained an administrative order declaring the KB claims invalid on the grounds that Plaintiff had not established that the KB claims were more valuable for the extraction of minerals than for wilderness values.

13.  Plaintiff appealed the decision of the administrative law judge to the Department of the Interior Board of Land Appeals (the "IBLA").  Department of the Interior regulations governing administrative appeals provide that the Secretary of the Interior may either allow the IBLA to decide an appeal or decide the matter himself.  The Secretary of the Interior allowed the IBLA to decide the appeal and, on February 10, 1998, the IBLA reversed the administrative law

COMPLAINT – 4

judge and affirmed the validity of the KB claims.  A true and accurate copy of that ruling is attached hereto, marked Exhibit B, and incorporated herein by this reference.

14.  On April 29, 1998, two months after the IBLA handed down its decision, third party intervenors filed a Petition for Secretary's Review asking that Defendant Babbitt assume jurisdiction over this case.  On October 30, 1998, Defendant Babbitt published in the Federal Register (63 FR 58411-02) a notification that he is reviewing the IBLA decision, and that the IBLA decision is stayed pending that review.   Although Plaintiff objected that the request for review had been untimely, and that the Secretary no longer had authority to review the matter, Defendant issued a briefing schedule, and the last briefs were filed on March 5, 1999. Defendants have taken no action on the matter since that time.

## REQUEST FOR MANDAMUS RELIEF

15.  Plaintiff perfected the KB claims in accordance with the requirements of the laws of the United States, and was therefore entitled under the Constitution of the United States and the mining laws enacted by the United State government, to take possession of the KB claims and to conduct mining operations and remove minerals from the claims.

16.  At all times material hereto, and continuing as of the date of this Complaint, the Defendants, and each of them had a non-delegable and non-discretionary administrative duty imposed by the statutes and laws of the United States to honor Plaintiff's duly recorded and perfected mining claims and right to the possession and use of the mining claims referred to above, and to permit Plaintiff to conduct mining operations and remove minerals from the claims.

COMPLAINT – 5

17.  Plaintiff filed its location notices for the KB claims on April 23, 1992.  The decision of the administrative law panel was rendered on February 10, 1998 affirming the validity of the claims, and Plaintiff's right to conduct mining operations on those claims.  The Secretary of the Interior has held up that decision for almost two years - - almost eight years since Plaintiff acquired Constitutionally protected rights in the KB claims, and sought to conduct mining operations upon them. Plaintiff has no adequate and speedy remedy at law to ensure protection of its rights.

18.  Defendant Bruce M. Babbitt, Jr., by and through his officers, agents and delegees, has effectively directed the BLM to prevent Plaintiff from conducting any mining operations on the KB claims and to prevent Plaintiff from removing any minerals from the claims.

19.  The acts and failures to act of Defendants, as hereinabove alleged, are arbitrary, capricious, contrary to law, and contrary to the statutory and constitutional rights of the Plaintiff in and to the KB claims.  Defendants owe to the Plaintiff a mandatory, ministerial and non-delegable administrative duty to allow Plaintiff to conduct mining operations and remove minerals from the KB claims.  Notwithstanding such duties, they have and continue to refuse to perform the duties owed to Plaintiff. Plaintiff has no adequate remedy at law for the failure of the Defendants to honor its valid and enforceable mining claims and permit Plaintiff to conduct mining operations in accordance with its property rights therein.

WHEREFORE, Plaintiff prays for relief as follows:

1.  That the Court enter its Order, in the nature of mandamus, pursuant to 28 U.S.C. Sec. 1361, adjudging that the Defendants are obliged to allow Plaintiff to conduct mining operations and remove water-worn boulders from the KB claims in exercise of its property rights under the United States Constitution.

**COMPLAINT – 6**

2. That Plaintiff have and recover of Defendants its costs of action, including reasonable attorneys' fees incurred in bringing and maintaining the instant action, pursuant to the Equal Access to Justice Act, or otherwise according to law.

3. That the Plaintiff have such other and further relief as to the Court seems just and equitable.

Dated: December 16, 1999

By _____
Kenneth D. Nyman

By _____
Christ T. Troupis
**Attorneys for Plaintiff**
**UNITED MINING CORPORATION.**

**COMPLAINT – 7**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
SHOSHONE DISTRICT OFFICE
400 WEST "F" STREET
P.O. BOX 2B
SHOSHONE, IDAHO 83352



IN REPLY REFER TO:
IDI-28593

March 17, 1993

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

## DECISION

United Mining Corporation            :
6733 West State Street               :            3809 Surface Management
Boise ID 83703                       :

### PROHIBITION FROM MINING

On February 4, 1992, Gary Ojala, acting as agent for United Mining Corporation located 14 placer building stone claims (KB-1 through KB-14) along the Big Wood River northeast of Shoshone, Idaho. Because of the unique geologic features along this stretch of the Big Wood River, the Bureau of Land Management (BLM) is pursuing permanent withdrawal from the operation of the mining laws. On July 8, 1992, a notice was published in the *Federal Register* segregating the land from mineral entry pending final withdrawal of seven segments of the river which contain the most outstanding examples of the water-worn sculptures.

By letter dated March 8, 1993, and received March 9, 1993, Gary Ojala, Manager of Resource Development for International Stone, Inc., filed a Notice of Intent to operate under 43 CFR 3809-1.3 for the 1993 field season on the "KB" placer claims. According to the notice, International Stone intends to initiate stone removal from the "KB" claims on April 1, 1993.

On March 11, 1993, the BLM initiated a contest action (IDI-29807) under 43 CFR 4.451 to determine the validity of the claims.

## DECISION

You are prohibited from mining and removing stone from the KB-1 through KB-14 building stone placer claims pending the outcome of the contest proceedings. *Southwest Resource Council*, 94 I.D. 56, 64-67 (1987).

EXHIBIT A

616

RATIONALE FOR DECISION

The river-smoothed lava rock is an exceptional resource. BLM geologists have determined that these rocks and rock sculptures are a "Great Natural Wonder". (See Proposals to Extract Water-Worn Boulders from the Big Wood River in Portion of Sections 2, 10, 11, 14, 15, and 22, T. 4 S., R. 18 E., B.M., by Terry S. Maley and Peter Oberlindacher, Supervisory Geologists, dated December 3, 1992). This report states that:

> *The study area which includes a four-mile segment of the Big Wood River represents a unique geologic resource. The unique geologic resource includes the entire environment such as the shape of the canyon, the coloration of the rocks, and seemingly artistic manner in which the sculptured forms blend together, and most of all, the special feeling one experiences while walking through the canyon.*
>
> *The form, character and extent of the Big Wood River was examined to determine how it compares to other exposed river beds in the experience of the examiners. The purpose of this examination was to determine whether the study area can be accurately categorized as a "Great Natural Wonder", that must be preserved for the public benefit. In the opinion of the authors, the channel of the Big Wood River in the study area is analogous to...and...the removal of these special features would destroy a "Great Natural Wonder" that should be preserved for the enjoyment of future generations.*

The Shoshone District BLM recognizes the uniqueness of the rock sculptures and the opportunity of providing for public interpretation. The district has segregated (withdrawn) the most outstanding sections of the Big Wood River from mineral entry under the Mining Law of 1872, including those segments covered by the "KB" claims.

The KB-1 through KB-14 mining claims contain some of the best examples of the sculptured rock. The variables affecting whether the rock present within a stream reach is of a quality of "Great Natural Wonder" include the number and placement of the rocks, and the shape, color, and texture of each individual rock. Whether these rocks may be appropriated under the Mining Law will be determined in the contest proceedings noted above.

Since a portion of your claims may lie in or near a Wilderness Study Area, a Notice of Intent is insufficient; a Plan of Operations may also be required.

The BLM's role in administering the public land resources is to provide balanced management of the land and resources so they will best serve the needs of the American people -- today and in the future. This decision will best provide for the long term needs of future generations, and their enjoyment of this non-renewable, and highly unique resource.

3

## RIGHT OF APPEAL

You have the right of appeal to the Idaho State Director, Bureau of Land Management, in accordance with 43 CFR 3809.4. If you exercise that right, your appeal, accompanied by a statement of reasons and any arguments you wish to present, which would justify reversal or modification of the decision, must be filed in writing at the office listed below within 30 days after you receive this decision. This decision is issued in full force and effect during the entire appeal period.

      State Director (920)
      Bureau of Land Management
      3380 Americana Terrace
      Boise ID 83706

      Mary C. Gaylord
      District Manager



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
4015 Wilson Boulevard
Arlington, Virginia 22203

IN REPLY REFER TO:

UNITED STATES

v.

UNITED MINING CORP.

IBLA 95-133

Decided   February 10, 1998

Appeal from a decision by Administrative Law Judge Ramon M. Child that the KB-1 through KB-14 placer mining claims are null and void.   IDI-29807.

Affirmed in part, vacated in part, and reversed in part.

1.   Act of August 4, 1892—Mining Claims: Placer Claims

   Neither South Dakota Mining Co. v. McDonald, 30 Pub. Lands Dec. 357 (1900), nor United States v. Bolinder, 28 IBLA 187 (1976), supports a conclusion that, as a matter of law, land embracing natural wonders are thereby removed from location under the mining law.

2.   Act of August 4, 1892—Mining Claims: Placer Claims

   The Building Stone Act of August 4, 1892, 30 U.S.C. § 161 (1994), provides that "[a]ny person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims." However, following passage of the Common Varieties Act, 30 U.S.C. § 611 (1994), to be locatable, building stone must have some property giving it a distinct and special value.

142 IBLA 339        EXHIBIT B

3.  Act of August 4, 1892—Mining Claims: Placer Claims

    As a general matter, the term "building stone" includes
    "all stones for ordinary masonry construction, orna-
    mentation, roofing, and flagging." Stone used in the
    construction of walls, nonstructural facings on build-
    ings, fireplaces, hearths, and decorative stone around
    fireplaces, patios, fountains, monuments, and for gen-
    eral landscaping purposes have all been found to fall
    within the category of building stone.

4.  Act of August 4, 1892—Mining Claims: Placer Claims

    The use, rather than the value, determines the class-
    ification of a mineral material as building stone,
    locatable under the Building Stone Act, 30 U.S.C. § 161
    (1994). High value of the stone can be used to iden-
    tify the mineral as an uncommon variety of building
    stone, however.

5.  Act of August 4, 1892—Mining Claims: Placer Claims

    The term "chiefly valuable" is a term which was
    included in laws passed during the time when the United
    States was classifying lands as agricultural for dis-
    posal. Its use was primarily for determining the rela-
    tive value of a given tract so that the lands could
    be disposed of pursuant to the correct statute. When
    building stone is found on the public lands in quantity
    and quality sufficient to render the land more valuable
    on account thereof than for agricultural purposes, the
    land should be deemed chiefly valuable for building
    stone.

6.  Act of August 4, 1892—Mining Claims: Placer Claims

    The Building Stone Act is applicable for building
    stone having some property giving it a distinct and
    special value. To possess distinct and special value,
    the building stone must possess geological uniqueness
    giving it value and making it readily distinguishable
    from the common variety of the same stone.

7.  Act of August 4, 1892—Mining Claims: Placer Claims

    The term "chiefly valuable" contemplates a rational
    comparison of values, and the measurement of those
    values must be quantifiable and in terms applicable
    to both sides of the equation.

142 IBLA 340

APPEARANCES:  Kenneth D. Nyman, Esq., and Christ T. Troupis, Esq., Boise, Idaho, for United Mining Corporation; Kenneth M. Sebby, Esq., Office of the Field Solicitor, U.S. Department of the Interior, Boise, Idaho, for the Bureau of Land Management; Roger Flynn, Esq., Boulder, Colorado, for intervenors; 1/ Kenneth D. Hubbard, Esq., M. Julia Hook, Esq., and Scott W. Hardt, Esq., Denver, Colorado, for amici curiae. 2/

OPINION BY ADMINISTRATIVE JUDGE MULLEN

United Mining Corporation (United Mining) has appealed a November 1, 1994, Decision issued by Administrative Law Judge Ramon M. Child declaring the KB-1 through KB-14 placer mining claims null and void.  Judge Child found the land subject to those claims to be more valuable for aesthetic and geological purposes than for the building stone found thereon or for any mining purposes.

The situs of the claims, the Big Wood River is located in south central Idaho, northwest of Shoshone, Idaho.  (Ex. C-7, at 2.)  The river bed is on the north central Snake River Plain, is virtually unnoticeable until one is very close to it, and is dry most of the time.  (Tr. 87-88.) The river bed consists of two channels:  (1) a broad shallow channel characterized by a shiny glaze or desert varnish ranging from 30- to 60-feet wide and 2- to 10-feet deep; and (2) a narrow, deep inner channel or canyon

---

1/  By Order dated Apr. 6, 1995, the Board granted intervener status to the Committee for Idaho's High Desert and the Connecting Point for Public Lands.
2/  On Apr. 3, 1995, ASARCO, Battle Mountain Gold Company, Hecla Mining Company, Phelps Dodge Corporation, and Santa Fe Pacific Gold Corporation filed a Motion seeking permission to file an amici curiae brief.  The Board granted amici curiae status in its Apr. 6, 1995, Order, supra, note 1.

varying between 1-foot and 30-feet wide and up to 40-feet deep.  (Ex. G-6,
at 10-11.)  It has a number of bedrock erosional features, including
channel variations, depositional and erosional segments, relict and
coalescing potholes, and shaped boulders.  (Tr. 102-103, 109; Exs. G-6-1
through 41; and Ex. G-10-1 through 11.)

     The geologic features found in the section of the river channel sub-
ject to the claims resulted from the confluence of three circumstances:
"(1) a homogeneous bedrock of basalt; (2) large flows of glacial meltwater
at the end of the last period of alpine glaciation; and (3) a large source
of durable igneous and metamorphic pebbles and cobbles transported from
the northern mountains."  (Ex. G-6, at 1; see Tr. 107-108.)  These geo-
logic features developed towards the end of the last ice age when glacial
meltwater coming off the mountains carried large volumes of rock and sand
to the Snake River plain.  (Ex. C-8, at 1.)  The flood waters migrated
to weak areas in the basalt, and carved the basalt creating the above
described geomorphological features.  Id.  Swirling action of driven peb-
bles and cobbles during high water flow carved grooves and cylindrical
potholes into the basalt and produced a rock sculpture effect.  Id.
The potholes grew and expanded and, at times, merged, creating the deep
inner channel.  (Tr. 94-96; Ex. G-6, at 11.)  The pothole erosion process
included the generation of large water-worn boulders which broke free when
the underlying rock was eroded away.  These boulders were subjected to
additional erosional sculpting as they rested on the canyon bottom,
ultimately forming unique configurations.  (Ex. G-6, at 17.)

IBLA 95-133

In March 1991, United Mining entered into a lease agreement with John Hisel, the owner of private property on the Big Wood River channel a few miles south of the claims. (Tr. 222.) United Mining was granted the right to remove and sell water-sculptured basalt boulders, and Hisel was paid a royalty for the material removed. Shortly after the lease was finalized, Gary Ojala, a consulting geologist employed by United Mining, was directed to find additional supplies of water-sculptured basalt boulders, called Holystones boulders. 3/

After extensive field examination, Ojala identified what he believed to be the best source of sculptured basalt on a portion of the Big Wood River managed by the Bureau of Land Management (BLM or Bureau). He then approached Dr. Terry S. Maley, a geologist employed by the BLM Idaho State Office, to ascertain how United Mining might acquire the sculptured basalt found on BLM land. (Tr. 224.) Maley advised Ojala that he considered the material Ojala sought to be a common variety of building material and that Ojala could acquire the sculpted basalt through a mineral material sale. (Tr. 224.) Ojala testified that he believed the boulders to be an uncommon variety of building stone, but that it appeared that the most expeditious way of obtaining the stone was to apply for a mineral material sales contract. (Tr. 225.)

On June 14, 1991, United Mining submitted Mineral Material Sales Application IDI 28953 seeking to purchase 180 tons of boulders from the

_____

3/ For convenience, the water-worn basalt boulders are sometimes referred to as Holystone boulders. This term is used by United Mining to identify the water-worn boulders in promotional and sales material. See Tr. 256.

BLM-managed portion of the Big Wood River riverbed during a 1-year period. (Ex. C-16, Attachment B; Tr. 33, 223-25.)

On July 18, 1991, BLM established the Riverbed Lava Community Pit (IDI 28547) along a portion of the channel. 4/ The Bureau then began a formal environmental assessment of the boulder removal program described in United Mining's application.

United Mining located the 14 KB placer mining claims on February 4 and 5, 1992, and filed the location notices for the claims with BLM on April 23, 1992. The claims embrace lands within secs. 3, 10, 11, 14, and 15, T. 4 S., R. 18 E., Boise Meridian, along the Big Wood River channel. 5/

The environmental assessment for United Mining's Mineral Material Sales Application was completed and the Environmental Assessment document (EA), dated April 22, 1992, was issued. This document is a part of Exhibit C-14 and contains a number of pertinent findings. Among them are:

> 1) "The Proposed Action" was "a mineral materials sale of 200 tons of basalt lava decorative stone boulders" to be removed "along a one-mile stretch of the Big Wood River (dry channel)" through an "exclusive contract." (EA at 1.)

> 2) The preferred alternative was the removal of material from a community pit. The applicant would remove 180 tons of mineral material from the community pit and do necessary reclamation in a 1-year period.

---

4/ Witnesses testifying for BLM gave conflicting testimony regarding the reason that BLM established a community pit. Bureau District Reality Specialist, Brown, testified that it was established to control stone sales. (Tr. 47.) District Manager Gaylor testified that BLM never intended to sell mineral material from the community pit, (Tr. 177), and that it was established to buy time while preparing withdrawal documents. (Tr. 183.) Maley testified that the pit was not established to withdraw the land from mineral location, but was established as a step in the process of selling stone to claimants. (Tr. 122-25.)
5/ Public lands within the Black Butte lava flow, including portions of the contested claims, are a part of the Lava Wilderness Study Area (WSA), created by BLM on Nov. 1, 1983. (Tr. 30; Ex. G-2.)

3) The proposed sale of decorative stone would help serve
public demand for natural materials in landscaping and interior
open space. * * * [The i]ntended market probably includes the
northwest and west coast of the United States and metropolitan
areas of the Pacific rim.  Id.

4) The proposed sale to the claimants and community pit
sales would "conform with multiple use recommendations."  Id.

5) No cultural resources were found in the area of the
proposed boulder removal.  (Supra, at 7.)

6) Recreation values are limited.  Id.

7) Removal of stone would not be permitted when water is
flowing in the Big Wood River channel.  Id.

8) "Visual resources of the area are Inventory Class II
in the neighboring Lava Wilderness Study Area.  The Lava WSA
has been recommended by BLM as nonsuitable for wilderness desig-
nat[ion] * * *.  The visual resources are Inventory Class III
in the area outside the Lava Wilderness Study Area.  Class II
resources allow stricter management than Class III with the
objective to retain the existing landscape character.  Manage-
ment activities may be seen but should not attract attention
of the casual observer.  Any change must repeat the basic ele-
ments of form, line, color, and texture in the predominant
natural features of the characteristic landscape."  Id.

9) "Air Quality, Areas of Critical Environmental Concern,
Farm Lands prime or unique, Floodplanes, Native American Reli-
gious Concerns, Cultural Resources, Livestock, Threatened or
Endangered Species, Wastes hazardous or solid, Water Quality
surface or underground, Wetlands or Riparian Zones, Wild and
Scenic Rivers, and Wildernesses" "would not be affected by the
proposed action or alternatives." (Supra, at 8.)

On July 8, 1992, BLM published a Notice in the Federal Register pro-

posing to withdraw the lands encompassed by the claims from mineral entry

to protect the unique geologic sites along the Big Wood River for a 2-year

period.  57 Fed. Reg. 30228-29 (July 8, 1992); see also Ex. 3.  The Notice

described the sites as containing a limited quantity of uniquely-shaped,

water-worn lava boulders and beautiful stone sculptures, and as possessing

high public value for recreational pursuits such as viewing, photography, exploring, and hiking.  57 Fed. Reg. 30229 (July 8, 1992).

Bureau geologists and mineral examiners, Terry Maley and Peter Oberlindacher, conducted a further field examination of a portion of the Big Wood River channel between October 7 and November 5, 1992.  In a report titled "Proposals to Extract Water-Worn Boulders from the Big Wood River in Portions of Sections 2, 10, 11, 14, 15, 21, and 22, T. 4 S., R. 18 E., B.M.," dated December 3, 1992, the examiners concluded that the area represented a unique geologic resource composed of the entire environment of the canyon including "the shape of the rock forms, the coloration of the rocks, the seemingly artistic manner in which the curiously sculpted forms blend together and most of all the special feeling one experiences in walking through the canyon composed of a myriad of remarkably unique sculptured rock."  (Ex. C-8, at 6.)  The examiners recommended that mining claims in the study area be invalidated, citing South Dakota Mining Co. v. McDonald, 30 Pub. Lands Dec. 357 (1900), and United States v. Bolinder, 28 IBLA 187 (1976), as a basis for declaring the claims null and void because they cover land described as a great natural wonder.  (Ex. C-8, at 6, 10).

No action was taken on the EA until December 3, 1992, when Mary E. Gaylord, District Manager, Shoshone District, issued a Finding of Significant Impact stating that "I have reviewed this environmental assessment (ID 050-EA-91074) including the explanation and resolution of any potentially significant environmental impacts.  I have determined that the proposed action will have significant impacts and will need an environmental impact statement if the proposed action were to be pursued."

IBLA 95-133

(Ex. C-14.)  In a December 4, 1992, letter addressed "Dear Public Land

User," the District Manager states:

> Enclosed is our Final Environmental Assessment and Deci-
> sion Record for EA # IDO50-EA-91074 entitled <u>River-Smooth Lava</u>
> <u>Material Sale Application—International Stone.</u>  The Final EA
> includes public comment letters received, and Bureau of Land
> Management responses to the concerns raised in the letter which
> pertain to the EA and the quality of impact analysis.  The Final
> EA reflects modifications made in response to the comments and
> reflects new information developed since the preparation of the
> Draft EA."

(Ex. C-14.)

United Mining's June 14, 1991, Mineral Material Sale Application was

rejected by BLM on January 28, 1993.  (Tr. 42.)  The notice of rejection

was not made a part of the record, but BLM's district realty specialist

testified that the application "was rejected as not in the public interest

with the notation that the resource site was identified as a unique geo-

logic resource and great natural wonder."  (Tr. 42.)  No appeal was filed.

On March 8, 1993, United Mining submitted a Notice of Intent pursuant

to 43 C.F.R. § 3809.1-3, advising BLM of its intent to conduct mining oper-

ations on the KB claims by removing boulders from the claims.  (Ex. G-15.)

The Notice of Intent identified the KB claims as building stone placer

claims.  (Ex. G-15, at 1.)  The Bureau responded by issuing a Decision

dated March 17, 1993, prohibiting mining and removal of stone from the

KB-1 through KB-14 building stone placer claims pending the outcome of the

contest proceedings, (Ex. G-16), which were initiated by the filing of a

contest Complaint on March 11, 1993.

In its Complaint, BLM alleged that:

> 1.  The land involved embraces a great natural wonder
> that should be preserved for public benefit, and is not the

142 IBLA 347

type of resource Congress intended to dispose of under the Min-
ing Law.  See South Dakota Mining Co. v. McDonald, 30 L.D. 357
(1900); United States v. Bolinder, 28 IBLA 187, 196 (1976).

    2.  The land involved is not mineral land within the mean-
ing of the mining laws because it contains formations and mate-
rial valuable as natural curiosities, but not mineral substances
usually developed by mining operations.  See South Dakota Mining
Co. v. McDonald, 30 L.D. 357 (1900).

    3.  The land involved is not chiefly valuable for building
stone.

(Complaint, paragraph 5.)

    United Mining answered, admitting and incorporating by reference, the

identification of the claims as building stone placer claims set forth in

Exhibit A to the Complaint.  (Answer, paragraph 2.)  United Mining denied

BLM's charges, specifically alleging, inter alia, that the land was chiefly

valuable for building stone.  (Answer, paragraph 7.)

    Judge Child held a formal hearing in Boise, Idaho, on April 4 and 5,

1994.  At the outset of the hearing, counsel for BLM stipulated:  (1) that

there is a market for the type of building stone found on the claims;

(2) that the values United Mining has received for the stone for the pur-

pose of decoration and landscaping are quite significant; and (3) that the

river-washed basalt boulders on the claims are an uncommon variety building

stone.  (Tr. 15-16.)  Six witnesses were then called by BLM:  BLM District

Reality Specialist Harold Brown, who discussed the chronology of related

land use actions in the area, (Tr. 23-50); Dr. John D. Hunt, a tourism

expert, who addressed the potential value of the unique pothole region of

the Big Wood River for tourism, (Tr. 50-70); Maley, a geologist assigned

to the Idaho State Office, BLM, who had investigated the area, and who

described the processes by which the potholes and boulders were formed and
the basis for his opinion that the Big Wood River channel contained the
best example of pothole erosion and bedrock erosion in terms of diversity
and quality he had ever seen, (Tr. 70-128; Ex. 6); Oberlindacher, another
geologist assigned to the Idaho State Office, BLM, who examined the claimed
area and opined that the uniqueness of the geologic attributes of the chan-
nel rendered the land chiefly valuable for its geologic significance rather
than for building stone, (Tr. 129-52; Ex. 10-1 through 10-11); Shoshone
District Outdoor Recreation Planner/Public Affairs Specialist Marty Sharp,
who summarized the public response supporting the proposal to withdraw
the area from entry under the mining laws, (Tr. 153-68); and Mary Gaylord,
Shoshone District Manager, BLM, who recounted BLM's escalating awareness of
the value of the resources of the Big Wood River and the consequent accel-
eration of management strategies to secure the resources for the public in
perpetuity.  (Tr. 169-205.)  The Bureau also introduced 52 photographs of
the area.  (Ex. G-6-1 through 41 and Ex. G-10-1 through 11.)

        After BLM rested its case, counsel for United Mining moved to dismiss
the complaint on the ground that the Government had failed to present a
prima facie case that the claims were invalid.  (Tr. 210-217.)  Judge Child
took the matter under advisement.  (Tr. 217, 220.)  United Mining proceeded
to present its case, introducing the testimony of two witnesses:  Gary
Ojala, consulting geologist, who discussed the events leading up to the
location of the KB claims, the uncommon nature of the boulders, the exis-
tence of boulders of marketable quality on each claim, the estimated

quantity of stone on the claims, the steps he took to locate the claims, and his opinion regarding the distinction between building stone and decorative stone; and William Jeffery Smith, the founder of United Mining, who related the uses for Holystone boulders, the prices for that stone, his profit margin, and the potential future markets for the stone from the claims. (Tr. 252-97.)  United Mining also tendered several exhibits, including receipts and invoices for stone sold from the Hisel property, (Ex. C-19-1 through 48), and photographs of some of the Holystone boulders United Mining had removed from the Hisel lease.  (Ex. C-20-1 through 6.)

Both parties submitted extensive post-hearing pleadings, proposed decisions, and responses in support of their respective positions.

In his Decision, Judge Child denied United Mining's motion to dismiss the complaint for failure to establish a prima facie case, finding that the evidence presented by BLM regarding the determinative issues actually preponderated.  (Decision at 5.)  He then addressed four issues: (1) whether BLM had established a prima facie case—Judge Child found that the Government had presented a prima facie case; (2) whether the Building Stone Act of August 4, 1892 (Building Stone Act), 30 U.S.C. § 161 (1994), applied to the claims—Judge Child found that it did; (3) whether the comparative value of the claimed land for purposes other than mining was relevant under the Act of May 10, 1872, as amended (1872 General Mining Law), 30 U.S.C. § 22 (1994)—Judge Child found that it was; and (4) whether the claimed land was more valuable for mining purposes—Judge Child found that it was not.

Judge Child outlined the principles controlling a determination of the validity of a placer claim located for building stone as required by the

Building Stone Act.  He stated that, for a building stone placer claim to
be valid, the stone found on the claim must be an uncommon variety, there
must be a discovery of a valuable mineral (i.e., the building stone can be
extracted, removed, and marketed at a profit), and the claimed land must
be chiefly valuable for building stone.  Noting that there was no dispute
that Holystone boulders were an uncommon variety of stone which could be
extracted, removed, and marketed at a profit, the only remaining dispute
was whether the land was chiefly valuable for building stone.  He stated
this question in terms of whether the value of the claimed land for mining
purposes exceeded its value for aesthetic, scientific, and recreational
purposes, and whether such a comparison of values affected the validity of
the claims.  (Decision at 5.)

    Judge Child rejected United Mining's contention that the Building
Stone Act did not apply to the claims because Holystone boulders derived
their special value from their suitability for ornamental uses rather than
for general building purposes.  Judge Child found that an uncommon variety
of building stone, locatable after the Common Varieties Act (30 U.S.C.
§ 611 (1994)) was passed in 1955, is stone that is used for purposes for
which common building stone is unsuited.  (Decision at 5-6.)  He found that
United Mining's attempt to differentiate between the stone's ornamental and
structural use was meritless because the Building Stone Act and case law
refer to ornamental application and landscaping as typical uses for build-
ing stone.  He added that United Mining's consulting geologist admitted
that building stone can be decorative and noted that Holystone boulders

had been sold or marketed to a masonry supply center, a building material
supplier, and Japanese architects, and had been used for the entrance of
a hotel.  (Decision at 7.)  Judge Child found that the few isolated sales
of Holystone boulders for art work did not demonstrate a sustainable market
for Holystone boulders for use in art work, declaring that the claimants
had not established a discovery of a valuable mineral deposit under the
general mining laws based upon sales of the boulders as art objects.
(Decision at 7.)  Judge Child concluded that the evidence indicated that
the Holystone boulders were building stone, that the claims were subject
to the Building Stone Act, and that there must be a determination regard-
ing whether the claimed land was chiefly valuable for building stone.
(Decision at 8.)

    After finding the Building Stone Act applicable to the claims, Judge
Child proceeded to consider whether the comparative value of the claimed
land for purposes other than mining was relevant under the general min-
ing laws.  After acknowledging that the Department had rejected the
comparative-values test for claims located under the 1872 General Mining
Law, 30 U.S.C. § 22 (1994), in Cataract Gold Mining Co., 43 Pub. Lands Dec.
248 (1914), and that the Board had reaffirmed the rejection of that test
in United States v. Kosanke Sand Corp. (On Reconsideration), 12 IBLA 282,
299-302 (1973), and In Re Pacific Coast Molybdenum Co., 75 IBLA 16, 33-34
(1983), Judge Child concluded that early Department decisions, Supreme
Court decisions, and Congressional Acts weighed against following this
precedent and in favor of the application of a comparative-values test

under the 1872 General Mining Law. (Decision at 8-11.) He concluded that, for any mining claim to be valid, the land must be more valuable for mining than for other purposes. (Decision at 11.)

Finally, Judge Child undertook a comparison of the building stone and the aesthetic and geologic resources. He cited evidence of the area's scenic and geologic uniqueness, noting testimony regarding the diversity, complexity, quality, and quantity of geological features of the bedrock erosion found in and around the claims. (Decision at 11.) He noted the BLM's witnesses' conclusion that the highest and best use of the land was preservation for the public, and he observed that none had attempted to place an estimate on the value of the land for aesthetic, scientific, and recreational purposes, but had cast its worth in terms of a natural wonder and treasure whose intrinsic value for aesthetic and geological purposes far exceeded the land's value for the mining of Holystone boulders. (Decision at 11.) Judge Child rejected United Mining's contention that the lack of any evidence of the value of the land for aesthetic and geological purposes precluded a finding that the land was more valuable for such purposes, holding that it was impossible to place a monetary value on irreplaceable, unique geological features that would be irretrievably lost if mining occurred, and concluded that the land was more valuable for geological and aesthetic purposes. (Decision at 11-12.) So finding, Judge Child declared the KB-1 through KB-14 building stone placer claims null and void because the claimed land was more valuable for aesthetic and geological

purposes than for any mining purposes, including mining of building stone.
(Decision at 13.)  This appeal followed.

In its Statement of Reasons for appeal (SOR), United Mining argues
that the Building Stone Act does not govern the KB claims because the
unrefuted evidence demonstrates that the best market for the water-worn
boulders on the claims is for ornamental uses and as artwork rather than
for structural purposes, and that the suitability of Holystone boulders for
ornamental and art application removes the boulders from being classified
as building stone locatable under the Building Stone Act.  (SOR at 1-2,
7-8.)  United Mining asserts that the KB claims are therefore governed by
the 1872 General Mining Law, 30 U.S.C. § 22 (1994), which, it contends, is
not susceptible to a comparative-values test, notwithstanding Judge Child's
Decision to the contrary.  (SOR at 2, 8-9.)

United Mining submits that, even if the comparative-values test were
applicable to the KB claims, BLM has failed to establish that the land
embraced by the claims is more valuable for nonmineral purposes.  (SOR
at 2.)  United Mining challenges Judge Child's dismissal of any requirement
that BLM present evidence that the claims are economically valuable for
nonmining purposes and the Judge's conclusion that the land subject to
the claims is an invaluable scientific and aesthetic treasure.  United
Mining argues that the Judge's interpretation of the general mining laws
conflicts with numerous legislative Acts specifically recognizing the
continuing validity of mining claims located in areas determined to be
worth preserving in their natural state.  (SOR at 10-11.)  United Mining

142 IBLA 354

IBIA 95-133

further contends that aesthetic and environmental considerations have never been a part of the mining laws and that, if a comparison between the value of the claims for mining purposes and their aesthetic and scientific value were appropriate, BLM would be required to place an economic value on the nonmineral uses, since the term "valuable" in mining cases means "valuable in an economic sense." (SOR at 12-13.) Accordingly, United Mining seeks to have this Board reverse Judge Child's Decision and declare the KB mining claims valid.

In its Answer, counsel for BLM argues that the KB claims are building stone placer claims under the Building Stone Act, that they are located on land chiefly valuable for aesthetic and geological purposes, and that, therefore, the claims are invalid. (Answer at 3.) Counsel for BLM also maintains that if the Building Stone Act were not applicable, the claims are invalid under the 1872 General Mining Law because the land is more valuable for aesthetic and geological purposes than for any mining purpose. Id.

In support of its position, counsel for BLM disputes United Mining's contention that the water-worn Holystone boulders are not building stone, citing United Mining's designation of the claims as building stone placers in its notice of intent to operate and United Mining's Answer to the contest Complaint in which United Mines admitted BLM's allegation that the claims were building stone placer claims and specifically alleged that the land was chiefly valuable for building stone. (Answer at 5.) Counsel for BLM further asserts that the uses of the Holystone boulders for landscaping

142 IBLA 355

and for structures such as waterfalls clearly falls within the Department's broad definition of building stone uses and that case law confirms that stone used for ornamentation and landscaping is considered to be building stone.  (Answer at 5-6.)

Counsel for BLM acknowledges that Judge Child's interpretation of the 1872 General Mining Law, 30 U.S.C. § 22 (1994), manifested by his applica- tion of a comparative-values test directly contradicts precedents of the Federal courts and this Board, but urges adoption of that analysis, sug- gesting that the issue merits reconsideration.  (Answer at 6-7.)  Counsel for BLM submits that lands having value for some other significant public purpose (such as preservation as a natural feature, a scenic landscape, or geologic resource) are not mineral lands within the mining laws and con- tends that United Mining has failed to satisfy its burden of demonstrating that the land is mineral in character, and thus has not demonstrated the validity of its claims.  (Answer at 18-19.)

Finally, counsel for BLM asserts that land included within the KB claims is not chiefly valuable for building stone or for mining purposes because it has greater value for geological and aesthetic purposes. (Answer at 19.)  Counsel argues that, because the Building Stone Act expressly provides that land entered for building stone must be chiefly valuable for building stone, the Building Stone Act and the 1872 General Mining Law require the Department to weigh the value of the land for natur- ally sculpted boulders as a mineral commodity against the value of the land for aesthetic and geological purposes.  (Answer at 20.)  Counsel admits

142 IBLA 356

that the monetary value of the individual boulders can be determined by objective criteria, but argues that the far greater value of the land is for aesthetic and geological purposes, which cannot be subjectively quantified or reduced to a dollar amount because its uniqueness renders it "irreplaceable."  (Answer at 20-21.)

Counsel for BLM acknowledges BLM's burden of establishing a prima facie case that the lands are not chiefly valuable for its mineral, urges the Board to find that it has met this burden through its evidence of the aesthetic and geological character of the land subject to the claims, and asks the Board to affirm Judge Child's Decision in all respects.

United Mining has filed a Reply Brief, focusing on the issue of whether BLM has carried its burden of proof by establishing that the KB claims are more valuable for aesthetic and geological purposes than they are for building stone.  United Mining contends that the Judge misapplied the comparative-values test by finding that BLM carried its burden, "despite the absence of any evidence that the area is economically valuable [for] any other purpose."  (Reply at 2.)  United Mining asserts that the Judge erred when finding that "the land represents an invaluable aesthetic and scientific treasure and is therefore not 'chiefly valuable' for the extraction of stone"  Id.  United Mining states that the "comparison of values" test had its genesis in statutes providing for the allotment of public lands for mineral and agricultural purposes, which precluded agricultural entries on lands more valuable for minerals and that, accordingly, early Departmental decisions addressing the "chiefly valuable" criteria

142 IBLA 357

required only that the land be more valuable for the specific mineral
than for agricultural purposes.  (Reply at 2-5.)  While United Mining
acknowledges that the phrase "chiefly valuable" as defined in the regula-
tions governing the mineral leasing program, 43 C.F.R. § 3500.0-5(j), has
expanded the comparison to include the land's value for any nonmineral
disposition, it points out that the regulatory definition requires a com-
parison of economic values, "not the subjective impressions of the trier
of fact concerning intangible virtues."  (Reply at 5-6.)

In its summation, United Mining states:

> [T]he Interior Department has long recognized that the phrase
> "chiefly valuable" came from early decisions comparing mineral
> and agricultural uses, and requires only a comparison of the
> economic value of a claim for mineral extraction with its eco-
> nomic value for agricultural purposes.  And even in those regu-
> lations and decisions in which the Interior Department has
> broadened the scope of the inquiry to include non-agricultural
> uses, the Department has always required that the comparison be
> based on present economic values.

(Reply at 6.)

In their briefs, amici curiae and intervenors address only the issue
of whether the 1872 General Mining Law incorporates a comparative-values
test.  The amici curiae argue that Judge Child incorrectly concluded that
a mining claim located under the 1872 General Mining Law is valid only if
the Department determines that the lands subject to the claim are more val-
uable for mining purposes than for all other purposes, asserting that the
Judge's flawed analysis contradicts more than a century of Departmental
and judicial precedent which establishes that both the Department and the

142 IBLA 358

U.S. Supreme Court have long rejected the use of the comparative-values test in favor of the prudent person test of claim validity.

Intervenors Committee for Idaho's High Desert and Connecting Point for Public Lands support the use of a comparative values test under the 1872 General Mining Law.  They contend that nonmineral values are necessarily considered when mining claim disputes center on conflicts between competing public land uses, that the comparative values test coexists with the prudent person and marketability tests, that the comparative values test complements existing Department consideration of nonmineral values in mining disputes, and that Federal land and mineral policy is best served by reaffirming the comparative values test.

[1]  As noted above, BLM cites two cases, South Dakota Mining Co. v. McDonald, 30 Pub. Lands Dec. 357 (1900), and United States v. Bolinder, 28 IBLA 187 (1976), as supporting its position that Congress intended to exclude land from disposal under the Mining Law if that land "embraces a great natural wonder that should be preserved for public benefit," as well as its position that, if the land contains formations and material valuable as natural curiosities, the land "is not mineral land within the meaning of the mining laws."  We will begin by examining those cases.

A good discussion of the South Dakota case is found in the Bolinder decision, and we find it appropriate to incorporate that discussion into this decision:

> In South Dakota, two parties claimed land which contained a cavern described as a great natural wonder.  One party sought the land under the homestead laws and the other under the mining laws.  The mining claimant protested against the homestead entry asserting the land to be mineral in character and the homestead

142 IBLA 359

entry fraudulent. After initial consideration, the Department ordered a further hearing on the issues in the case, stating, as quoted at 30 L.D. 359:

> This action is not to be construed as a determination of the question, so ably argued by the attorneys on each side, as to whether land chiefly valuable for its crystalline deposits can be entered under the mining laws of the United States.

After the second hearing, the Commissioner of the General Land Office (predecessor of the Bureau of Land Management) found the land to be nonmineral in character but held the homestead entry for cancellation because there was insufficient evidence of cultivation and improvement to establish the good faith of the entryman as a homestead claimant. On appeal, these findings were sustained. As pertinent to the question involved here, there is only the following discussion at 30 L.D. 360 sustaining the finding of nonmineral character of the land:

> Large quantities of crystalline deposits, and formations of various kinds, such as stalactites, stalagmites, geodes, "box-work," "frost-work," etc., etc., are found in the cavern. Specimens of these deposits and formations have been made the subject of sale at remunerative prices by the contending parties, not as minerals but as natural curiosities. Charge has also been made for admittance to the cavern and for the privilege of viewing its many natural wonders. The record clearly demonstrates that it is the source of revenue which these things furnish that the respective parties are striving to control.
>
> The testimony introduced by the protestant company for the purpose of showing that the cavern contains valuable deposits of gold, marble, building stone, paint rock, and other mineral substances, falls far short of proving the land to be mineral in character within the meaning of the mining laws. It is not shown to contain deposits, in paying quantities, of any of the substances mentioned, or of any other substance such as is usually developed by mining operations. No serious effort has ever been made to develop the land, or any part of it, as a mining claim. The decision of your office holding the land to be non-mineral is clearly correct.

The question which was left open when the second hearing was ordered, i.e., whether land chiefly valuable for crystalline deposits may be considered mineral in character, was not resolved

IBLA 95-133

by the Departmental decision after that hearing.  The two para-
graphs quoted above do not answer the question.  Instead, it is
apparent that the finding of nonmineral character of the land
was based upon the lack of a good faith mining operation.  The
exploitation of the cave and its contents were considered as
outside a normal mining operation.

United States v. Bolinder, supra, at 194-96 (emphasis added).

A careful reading clearly discloses that South Dakota turns on a find-
ing that the claim was "not shown to contain deposits, in paying quanti-
ties, of any of the substances mentioned, or of any other substance such as
is usually developed by mining operations.  No serious effort has ever been
made to develop the land, or any part of it, as a mining claim."  South
Dakota Mining Co. v. McDonald, supra, at 360 (emphasis added).  The Acting
Secretary reached this finding by applying the "prudent man test," found in
Castle v. Womble, 19 Pub. Lands Dec. 455 (1894).  The prudent man test is
satisfied if "minerals have been found and the evidence is of such a char-
acter that a person of ordinary prudence would be justified in the further
expenditure of his labor and means, with a reasonable prospect of success,
in developing a valuable mine."  Id. at 457.

The basis for the holding in South Dakota Mining Co. v. McDonald is
unmistakable.  The statement therein that "specimens * * * have been made
the subject of sale at remunerative prices by the contending parties, not
as minerals, but as natural curiosities" was offered as proof that the
claim was not being held for legitimate mining purposes.  This case does
not support BLM's broad assertion in paragraph 5 of its Complaint that the
"land involved embraces a great natural wonder that should be preserved for

142 IBLA 361

IBLA 95-133

public benefit, and is not the type of resource Congress intended to dis-
pose of under the Mining Law." If the evidence in the case now before us
had demonstrated that United Mining had contemplated charging admittance to
the site and selling pieces of the material for curiosities or keepsakes,
it would be proper to cite South Dakota Mining in a complaint alleging that
its claims are not valid. 6/  However, there is no question that United
Mining intends to conduct a mining operation on the claims.

Similarly, the holding in United States v. Bolinder, 28 IBLA 187
(1976), does not support the legal conclusion expressed in BLM's Complaint.
In Bolinder, BLM had appealed an administrative law judge's decision find-
ing a deposit of geodes subject to appropriation under the General Mining
Law.  After the above quoted discussion of the facts leading to the South
Dakota decision, the discussion in Bolinder continued:

> There is no doubt that a geode is composed of recognized
> mineral substances which would be individually locatable under
> the mining laws unless found to be a common variety subject to
> 30 U.S.C. § 611 (1970).  The testimony at the hearing indicated
> that geodes possess an economic value in trade and the ornamental
> arts, apart from whatever commercial value may be attributed to
> their uniqueness as a so-called "natural curiosity."  The appel-
> lees testified that the geodes are removed through mining opera-
> tions which they conduct or which are conducted by third parties
> with the particular appellee receiving a share of the geodes
> removed (Tr. 56-59, 113-15, 120).

> \*           \*           \*           \*           \*           \*           \*

---

6/  If claims are held for the purposes other than mining, as was concluded
in the South Dakota case, the question of discovery need not be addressed
to reach a finding that the claims are invalid.  See U.S. v. Zimmer,
81 IBLA 41 (1984); United States v. Elkhorn Mining Co., 2 IBLA 383 (1971),
aff'd, Elkhorn Mining Co. v. Morton, Civ. No. 2111 (D. Mont. Jan. 19,
1973).  Even when a discovery can be shown to exist, "proof of bad faith
can invalidate a claim, since in such a situation the mineral values are
incidental to the purpose for which the land is claimed."  In re Pacific
Coast Molybdenum Co., supra, at 35.

IBLA 95-133

We find no justification for ruling that geodes per se are not subject to location under the mining laws. Where a mining claimant has located his claim on a sufficient quantity of geodes and is conducting actual mining operations to extract the geodes, we hold that such a mineral deposit is subject to location under the mining laws. Furthermore, there is simply no evidence upon which we could make a finding that these deposits of geodes are not valuable mineral deposits.

United States v. Bolinder, supra, at 199-200.

As can readily be seen, nothing in either South Dakota or Bolinder supports either BLM's assertion or Judge Child's conclusion that, as a matter of law, land which might be described as embracing a natural wonder is thereby removed from location under the mining law, without requiring any affirmative Departmental or Congressional action to effectuate such a result.

We now find it appropriate to reiterate certain of the facts that were uncontested at the time of the hearing. To the extent that Judge Child based his Decision on the following facts, which were either stipulated or were admitted at the time of the hearing, we affirm his Decision. Counsel for BLM stipulated that the Holystone boulders were "an uncommon variety of building stone"; that the Holystone boulders have unique properties imparting a distinct and special value; and that the Holystone boulders were locatable under the Building Stone Act. Counsel for BLM further stipulated that the Holystone boulders could be extracted, removed, and marketed at a profit. (Tr. 15; Decision at 5.) There is no argument that the claims were monumented and posted in a manner that met Federal and state requirements. (Tr. 122.) We also find that the third allegation of the Complaint states that the claims are identified on Exhibit A to the

142 IBLA 363

Complaint, that all of the claims that are subject to this appeal (KB-1 through KB-14 (IMC 169640 through IMC 169653)) are individually described as building stone claims, and that the Answer filed by United Mining "[a]dmits the allegations of Paragraph 3 that the mining claims are * * * identified as set forth in Exhibit A to the Complaint, a copy of which is attached hereto and incorporated herein by reference."  (Answer at 2).

We are aware that United Mining agreed that the claims are building stone placer claims.  In United States v. Williamson, 43 IBLA 264 (1980), the Complaint alleged that certain lands subject to a special use permit issued by the Forest Service were not open to entry.  At the hearing, the claimant stipulated to the correctness of this allegation, but, on appeal, the Board recognized that parties may not stipulate to an erroneous theory of law.  United States v. Ideal Cement Co., 5 IBLA 235 (1972), aff'd sub nom. Ideal Basic Industries v. Morton, 542 F.2d 1364 (9th Cir. 1976).  As a result, the allegation that the lands were not open to entry because they were subject to a special use permit was dismissed, and the Board vacated the stipulation erroneously entered into by the parties.  United States v. Williamson, supra, at 276.  Notwithstanding United Mining's admission that the claims are building stone placer claims, we deem it appropriate to examine whether, as a matter of law, the claims are building stone placer claims.

[2]  The pertinent part of the Building Stone Act provides that "[a]ny person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims."  30 U.S.C. § 161

(1994).  After the Building Stone Act was enacted, various mineral materi-
als used in construction, including sand and gravel, were deemed locatable
under the Building Stone Act. 7/

The scope of materials locatable under the Building Stone Act was sub-
stantially altered in 1955 when Congress passed the Common Varieties Act,
30 U.S.C. § 611 (1994).  The Common Varieties Act made common varieties
of mineral materials no longer locatable under the Building Stone Act.
However, as noted by the Supreme Court, the Building Stone Act remained
"entirely effective as to building stone that has 'some property giving it
a distinct and special value' (expressly excluded under § 611)."  United
States v. Coleman, 390 U.S. 599, 605 (1968); McClarty v. Secretary of the
Interior, 408 F.2d 907, 908 (9th Cir. 1969); United States v. Haskins,
59 IBLA 1, 42-43 n.26 (1981).

[3]  On appeal, United Mining insists that the Holystone boulders are
decorative stone locatable under the General Mining Law and not building
stone subject to the Building Stone Act.  It contends that building stone
is used as a structural component of a building and decorative stone which
is used in landscaping, for aesthetics and visual affect, or for decorative
purposes, is not building stone.  United Mining acknowledges that stone
used as a structural component of a building could also be decorative, but
argues that decorative stone is not normally part of a building.

At the hearing, in response to questions by Judge Child, United Mining
witness, Ojala, characterized decorative stone used next to an elevator

_____
7/  Mineral material which is principally valuable for use as fill, sub-
base, ballast, riprap, or barrow was never locatable.  U.S. v. Verdugo &
Miller, Inc., 37 IBLA 277, 279 (1978).

lobby or as a fireplace mantel as building stone with a decorative compo-
nent.  (Tr. 245-46.)  Ojala also testified as to the planned uses of the
stone from the claims, stating that United Mining intended to use the
boulders for landscaping and decorative stone similar to the uses of the
Holystone boulders from the Hisel property.  (Tr. 249.)  United Mining also
cites Smith's testimony concerning the uses of the stone from the Hisel
property (in a waterfall, (Tr. 263), the entryway of a hotel, (Tr. 276),
and as art work, (Tr. 267, 278)) as evidence that the water-worn boulders
are not building stone.  Smith also indicated that the stone had been sold
to a masonry supply company, (Tr. 265), and a building materials supplier,
(Tr. 273-74), and that he was attempting to market the stone to Japanese
architects for use in oriental architecture.  (Tr. 281-82.)

Ojala acknowledged that the distinction he made between building stone
and decorative or landscaping stone might not be one applicable in law.
(Tr. 245.)  By definition, the term "building stone" includes "all stones
for ordinary masonry construction, ornamentation, roofing, and flagging."
A Dictionary of Mining, Mineral, and Related Terms, U.S. Bureau of Mines
(1968), page 149 (emphasis added).  There is clear precedent for a finding
that stone used in the construction of walls, fireplaces, patios, and for
general landscaping purposes falls within the category of building stone.
United States v. Melluzzo, A-31042 (July 31, 1969).  Similarly, mineral
material used for nonstructural facings on buildings, decorative stone
around fireplaces, or for landscaping has been deemed to be building stone.
United States v. Shannon, A-29166 (Apr. 12, 1963); see also United States

v. Gardner, 14 IBLA 276, 282 (1974) (stone used for construction of fire-
places is used as building stone but when used for artifacts is not used
as building stone); United States v. Chartrand, 11 IBLA 194, 239 (1973)
(Thompson, dissenting in part) (traditional construction purposes for
building stone include landscaping, fireplace, and patio construction);
United States v. U.S. Minerals Development Corp., A-30407 (Apr. 30, 1968)
(stone used as veneer in walls, in fireplaces and hearths, and in patio
floors); United States v. Melluzzo, A-29074 (May 20, 1963) (stone used as
decorative stone in fireplaces, patio walls, fountains, and for entryway
floors).

[4]   United Mining also believes the high value of the stone on the
claims precludes classifying the stone as building stone.  That value,
however, rather than excluding the stone from the building stone category,
identifies the stone as an uncommon variety of building stone.  See United
States v. Thomas, 1 IBLA 209, 217 (1971); United States v. U.S. Minerals
Development Corp., supra.  It is the projected use of Holystone boulders,
not the value of the Holystone boulders, that determines whether the stone
is building stone or mineral material locatable under the General Mining
Law. 8/  To the extent that Judge Child found the Holystone boulders to be
building stone, subject to the Building Stone Act, we affirm his Decision.

Having found the KB claims to have properly been located as building
stone placer claims, we find it unnecessary to revisit the question whether

_____

8/  We recognize that, if the weight of the evidence was that the primary
use of Holystone boulders removed from the Hisel property was for artwork,
the use may properly be considered as other than for building stone.  How-
ever, it was not demonstrated that a sustainable market would exist if the
stone was sold exclusively as artwork.

the comparative-values test applies to claims located under the 1872 General Mining Law, 30 U.S.C. § 22 (1994), and we hereby vacate that portion of Judge Child's Decision finding the comparative-values test applicable to the 1872 General Mining Law. 9/

[5]  In its Complaint, BLM alleged that the KB claims are not valid because the land embraced by those claims was not "chiefly valuable" for building stone.  On appeal, United Mining advances two reasons for its belief that Judge Child committed reversible error when finding that the land subject to the KB claims was more valuable for aesthetic and geological purposes than for building stone.  First, it argues that there is no legal basis for treating either aesthetics or the preservation of a geological resource as a land use of the type contemplated by Congress in 1892, when Congress enacted the Building Stone Act.  Second, it alleges that BLM failed to present any meaningful evidence that would allow a proper and sustainable valuation of the land for its aesthetic and geological value such as would permit a meaningful determination of whether the land subject to the claims was chiefly valuable for building stone.  In addressing these assertions, we must first decide what the drafters of the Building Stone Act intended when employing the term "chiefly valuable."

When attempting to derive the meaning properly ascribed to a statutory phrase, it is often helpful to look at the meaning attached to the same

_____

9/  Under the 1872 General Mining Law, "if the discovery of a valuable mineral deposit be shown, a valid claim exists, regardless of a more beneficial use to which the land might be put."  United States v. Kosanke Sand Corp. (On Reconsideration), supra, at 302.  See also In Re Pacific Coast Molybdenum Co., supra; United States v. Osborne (Supp. on Judicial Remand), 28 IBLA 13, 43 (1976); Cataract Gold Mining Co., supra.

IBLA 95-133

phrase in other legislation adopted or in effect at the same time, the
meaning ascribed by those who originally drafted regulations to implement
the Act, and contemporary court interpretation of the phrase.

In 1891, there were numerous statutes providing for the disposal of
public lands.  These included agricultural entries under the Homestead and
Desert Land Act, Scrip and similar Acts, grants to state and railroads,
townsite entries, mineral entries (lode, placer and mill site); and sales
under Acts such as the Timber and Stone Act.  Each of these dispositive
vehicles had provisions to ensure that the land was suitable for the
intended purpose.  For example, homestead entries, railroad grants, and
state land grants would not be issued if the land was known to be mineral
in character.  A mineral patent would not be issued without proof that the
land was mineral in character.  The legal litmus test applied to all of
these statutory provisions was whether the land was deemed to be mineral in
character.  If the land was mineral in character, it could be acquired only
through the mining laws.  If it was nonmineral in character, it was subject
to appropriation under the other public land laws, as long as it was of a
character contemplated by the statute being applied. 10/

Examination of what Congress intended when it used the phrase "chiefly
valuable" has been undertaken before.  In Yankee Gulch Joint Venture v.
BLM, 113 IBLA 106, 159 (1990), we quoted with approval the following BLM
explanation of the term "chiefly valuable" found in 49 Fed. Reg. 17892,
17893 (Apr. 25, 1984):

> The term "chiefly valuable" is an antiquated term which was
> included in the law at a time when the United States was

---

10/  For example, the character of the land subject to homestead entry was
not the same as land subject to desert land entry.

142 IBLA 369

the public lands in quantity and quality sufficient to render the land more valuable on account thereof than for agricultural purposes, that deposit should be treated as coming within the purview of the mining laws.  This interpretation does not include a comparison of the "aesthetic" and "geological" value.  An evaluation strictly on the basis of the land's "aesthetic" or "geological" worth with no regard to its worth for agricultural purposes does not comport with the intent of Congress when it enacted the Building Stone Act, 30 U.S.C. § 161 (1994), or with the Department's clearly stated interpretation of that Act since that time.

[6]  Judge Child held that geologic uniqueness could render a claim invalid.  The Supreme Court stated that the Building Stone Act remains "entirely effective as to building stone that has 'some property giving it a distinct and special value' (expressly excluded under § 611)."  United States v. Coleman, supra.  To possess distinct and special value, the building stone must be geologically unique.  Its uniqueness gives it value and makes it readily distinguishable from the common variety of the same stone. 11/

[7]  On appeal, United Mines objects to the basis for Judge Child's "value" determination and maintains that Judge Child did not properly weigh the relative values when ascertaining whether the land is chiefly valuable for building stone.  The term "chiefly valuable" contemplates a

─────────────────

11/  The testimony of the BLM witnesses establishes that the geomorphic alteration of the basalt rendered common variety basalt locatable building stone.  If a claim located on a deposit of building stone can be deemed invalid because the deposit is "geologically unique," locatable building stone must be unique, but not too unique, distinct, but not too distinct, and special, but not very special.  There is no basis for a conclusion that a prudent man would not expend time and means to develop a mine because the deposit might be too unique.

142 IBLA 372

IBLA 95-133

It may be well to note in this connection, that soon after the decision in the case of Colin v. Kelly, [12 Pub. Lands Dec. 1 (1891)], wherein lands containing stone, useful only for building purposes, were held not subject to the operation of the mining laws, Congress, by act of August 4, 1892 (27 Stat. 348), especially declared that lands "chiefly valuable for building stone" should be enterable "under the provisions of the law in relation to placer mineral claims." It would thus seem that Congress regarded even the ruling in that case as a departure from the liberal construction theretofore adopted by the Land Department to such an extent as to demand legislative action disapproving the result thereof.

Sufficient has been said to show what has been the long-continued practice of the Land Department, and to point out the danger and harmful results of a departure from that practice at this late date. Independently of these things, however, it may be added that the construction, as an original proposition, appears to be clearly right. The Department, therefore, in concluding this branch of the case, adheres to the rule:

> That whatever is recognized as a mineral by the standard authorities on the subject, whether metallic or other substance, when the same is found on the public lands in quantity and quality sufficient to render the land more valuable on account thereof than for agricultural purposes, should be treated as coming within the purview of the mining laws.

Pacific Coast Marble Co. v. Northern Pacific R.R. Co., 25 Interior Dec. 233, 244-45 (1897).

United Mining acknowledges that the land subject to its claims contains geologic and aesthetic values, but maintains that Congress did not intend to have "geologic" and "esthetic" values weighed when ascertaining whether the land is chiefly valuable for building stone. The provision in the Building Stone Act, 30 U.S.C. § 161 (1994), declared that lands "chiefly valuable for building stone" should be enterable "under the provisions of the law in relation to placer mineral claims." As noted above, when this law was enacted the Department restated its adherence to the pronouncement made 24 years previously that, whenever a mineral is found on

142 IBLA 371

the public lands in quantity and quality sufficient to render the land more

valuable on account thereof than for agricultural purposes, that deposit

should be treated as coming within the purview of the mining laws.  This

interpretation does not include a comparison of the "aesthetic" and "geo-

logical" value.  An evaluation strictly on the basis of the land's "aesthe-

tic" or "geological" worth with no regard to its worth for agricultural

purposes does not comport with the intent of Congress when it enacted

the Building Stone Act, 30 U.S.C. § 161 (1994), or with the Department's

clearly stated interpretation of that Act since that time.

[6]  Judge Child held that geologic uniqueness could render a claim

invalid.  The Supreme Court stated that the Building Stone Act remains

"entirely effective as to building stone that has 'some property giving it

a distinct and special value' (expressly excluded under § 611)."  United

States v. Coleman, supra.  To possess distinct and special value, the

building stone must be geologically unique.  Its uniqueness gives it value

and makes it readily distinguishable from the common variety of the same

stone. 11/

[7]  On appeal, United Mines objects to the basis for Judge Child's

"value" determination and maintains that Judge Child did not properly weigh

the relative values when ascertaining whether the land is chiefly valuable

for building stone.  The term "chiefly valuable" contemplates a

_____

11/  The testimony of the BLM witnesses establishes that the geomorphic
alteration of the basalt rendered common variety basalt locatable building
stone.  If a claim located on a deposit of building stone can be deemed
invalid because the deposit is "geologically unique," locatable building
stone must be unique, but not too unique, distinct, but not too distinct,
and special, but not very special.  There is no basis for a conclusion that
a prudent man would not expend time and means to develop a mine because the
deposit might be too unique.

142 IBLA 372

rational comparison of values, and the measurement of those values must be quantifiable, using units of measurement applicable to both sides of the equation. 12/ Accepting an unquantifiable statement of value, such as a conclusion that the land is "unique," or "priceless," or "irreplaceable," for one use and demanding a value of the same land quantified in a dollar amount for the other use would render any decision arbitrary. The evidence presented by BLM established that the land is geologically unique. It did not establish a quantifiable value for that land.

We are in full agreement with the observations regarding the dissenting opinions found in Deputy Chief Judge Harris' concurring opinion.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Decision of Judge Child is affirmed in part, and vacated in part, and reversed in part.

R.W. Mullen
Administrative Judge

We concur:

James L. Byrnes
Chief Administrative Judge

James L. Burski
Administrative Judge

C. Randall Grant, Jr.
Administrative Judge

12/ The fact that one or more persons express an opinion that the land is "unique," or "priceless," and "irreplaceable" does not establish value. The same has been said about the London Bridge, the Elgin Marbles, and Van Gogh's "Irises." A value has been found for each of these objects.

DEPUTY CHIEF ADMINISTRATIVE JUDGE HARRIS CONCURRING:

I concur with the opinion authored by Judge Mullen and his conclusion that Judge Child erred in holding that the land embraced by the KB-1 through KB-14 placer mining claims "is more valuable for aesthetic and geological purposes than for building stone or for any other mining purpose." In his opinion, Judge Mullen found that the claims contain an uncommon variety of building stone making the land embraced by the claims locatable as building stone placer claims under the Building Stone Act, 30 U.S.C. § 161 (1994), and that the Holystone boulders can be extracted, removed, and marketed at a profit. With these findings, the dissenters do not disagree.

The divisive issue in this case is what is meant by the term "chiefly valuable," as used in the Building Stone Act. Judge Mullen explores the history of the Building Stone Act and concludes that one need only compare the value of lands for mineral purposes with the value of land for agricultural purposes to satisfy the chiefly valuable test of the Building Stone Act. He states that if building stone is found on the public lands in sufficient quantity and quality as to render the land more valuable for the minerals than for agricultural use, the land must be considered to be chiefly valuable for building stone under the Building Stone Act. He holds that "aesthetic and geological purposes" may not be considered as a comparable use under the chiefly valuable test.

The dissenters, on the other hand, find little difficulty in extending the chiefly valuable test to include a comparison of values other than for agricultural purposes. In fact, they find no limitation on the ability

142 IBLA 374

IBLA 95-133

of the Department to engage in a broad-ranging public policy determination considering the values of any other competing uses for the land in determining whether land is chiefly valuable for building stone.  Judge Arness concludes that the lands are not chiefly valuable for building stone in this case because he finds that "BLM [the Bureau of Land Management] established that the contested lands are geologically unique and that their disturbance by mining will constitute the destruction of a natural wonder unlike any other in the world."  Also, the dissenters would not require any quantification of the value of the lands for retention and preservation thereby adopting Judge Child's view in this case that the balancing of economic values is unnecessary.

I cast my vote with Judge Mullen for a limited construction of the term "chiefly valuable."  Following the period of acquisition of the public domain, the Federal Government engaged in a policy of disposition of those lands, first, for the purpose of raising revenues, and, later, to encourage the settlement and development of the West.  Settlement laws required that lands disposed of not be known to be mineral in character at the time of disposition.  If lands were known to be mineral in character, disposal could only occur under the mining laws.  Thus, the term "chiefly valuable" was inserted in the Building Stone Act as a test to determine the proper statute under which disposal of lands would take place.

For purposes of leasing certain minerals pursuant to the Mineral Leasing Act, 30 U.S.C. §§ 262, 272, 282 (1994), the Department has defined the term "chiefly valuable" as follows:

> (j)  Chiefly valuable means a valuable deposit where there is no significant conflict between the extraction of sodium,

142 IBLA 375

> sulphur or potassium and any <u>non-mineral disposition of the
> lands</u>. Where such extraction conflicts with <u>other disposition</u>,
> the lands shall be deemed chiefly valuable for sodium, sulphur
> or potassium extraction if the economic value of the lands for
> extraction of such minerals exceeds its economic value for any
> <u>non-mineral disposition</u>.

43 C.F.R. § 3500.0-5 (emphasis added). It was recognized in the drafting

of that regulation that "chiefly valuable" was "an antiquated term which

was included in the law at a time when the United States was classifying

lands as agricultural for disposal. Its use was primarily for determining

the relative value of a given tract so that the lands could be <u>disposed of</u>

<u>pursuant to the correct statute</u>." 49 Fed. Reg. 17892-93 (Apr. 25, 1984)

(emphasis added). Thus, under the Mineral Leasing Act, chiefly valuable

determinations are limited to comparisons of the economic value of mineral

extraction with the economic value for any nonmineral disposition.

The chiefly valuable test of the Building Stone Act remains a part of

the law today; however, the policy of disposition of public lands no longer

exists. It has been replaced by a policy of retention and management of

public lands. Nevertheless, the Building Stone Act requires a comparison

of values for the purpose of <u>disposition</u>, not retention.

The dissenters ignore any distinction between disposition and reten-

tion and easily adapt the Building Stone Act to the 20th century. I

believe any adaptation of the Building Stone Act to the 20th century should

be accomplished by Congress.

In his dissent, Judge Irwin cites the case of <u>United States v.</u>

<u>Melluzzo</u>, 76 Interior Dec. 181, 188-89 (1969), as evidence that the Depart-

ment has engaged in comparative value analysis beyond the historical con-

text of the Building Stone Act in building stone cases. In <u>Melluzzo</u>, the

mining claims were contested on two bases:  the land embraced by the claims
was not chiefly valuable for building stone and there was no discovery of
a valuable mineral deposit.  In addressing the chiefly valuable issue, the
Department held the claims to be invalid because the lands on which the
claims were located were more valuable for nonmining purposes (residen-
tial), than for building stone.

No previous Departmental precedent is cited in _Melluzzo_ for under-
taking such a comparison, and it is not supported by cases examining the
question of whether lands are mineral in character.  For example, in _State
of Washington v. McBride_, 13 Pub. Lands Dec. 199 (1894), the State of
Washington protested a mineral patent application for six mining claims
alleging that the lands covered by the claims passed to the State upon its
admission to the Union.  The State presented evidence that the lands had
significant value as town lots with values ranging from $3,000 to $6,000
per acre.  However, the Secretary of the Interior found the evidence of
nonmineral values to be "immaterial" because "whatever its value for such
purpose may be, it would still be disposed of under the mining laws, if in
fact mineral land."  _Id._ at 207.  He did acknowledge, however, that such
evidence could be used to establish that mining claims had been located for
nonmining purposes.

Unlike the present case, there was in _Melluzzo_ an independent ground
for declaring the claims invalid—lack of discovery of a valuable mineral
deposit.  Moreover, it is clear from the facts of the _Melluzzo_ case that
the Government could have contested the claims on the basis of lack of

good faith.  Thus, the comparative value of the land for residential pur-
poses would have been relevant in Melluzzo to show that the claims had been
located under the mining law for nonmining purposes.

Even assuming that Melluzzo supports an expanded inquiry to include
nonagricultural uses, such uses would be limited to competing values for
disposition of the lands, and the method to evaluate competing uses would
be, as the Department has always required, to compare present economic
values.

However, based on the dissenters' logic, the Government may now assert
that retention of lands embraced by building stone placer mining claims is
more valuable than exploitation of the minerals, and, regardless of the
evidence supporting marketability of the mineral deposit, the Government
may prevail without presenting any quantitative evidence of the value of
retention.

While I personally believe, based on the record in this case, that
retention of the lands in public ownership would be desirable, a result
that could be accomplished by Congress or the President, Appellant has
shown that the lands in question are chiefly valuable for building stone
and the contest complaint must be dismissed.

For these reasons, I concur in the opinion authored by Judge Mullen.

_____
Bruce R. Harris
Deputy Chief Administrative Judge

I concur:

_____
David L. Hughes
Administrative Judge

142 IBLA 378

IBLA 95-133

ADMINISTRATIVE JUDGE IRWIN DISSENTING:

By the time the Bureau of Land Management (BLM) acted to protect the Big Wood River channel as a unique natural formation, the United Mining Corporation had already claimed the right to remove some of the features that make it unique.  After a contest hearing, Administrative Law Judge Ramon Child held the lands are not "chiefly valuable for building stone" under the Building Stone Act, 30 U.S.C. § 161 (1994), but are more valuable for their aesthetic and geological characteristics.  The majority reverses Judge Child on this issue.  1/  The majority thus decides the Big Wood River channel is chiefly valuable as a source of boulders that can be removed, weighed, priced, and conveyed for gardens in Japan and lobbies in Las Vegas.

The majority holds that the "term 'chiefly valuable' contemplates a rational comparison of values, and the measurement of those values must be quantifiable, using units of measurement applicable to both sides of the equation."  (Majority opinion at 372-73.)  In my view, this approach does not comprehend the difference between the value of natural formations left in place as they were created and the value of things bought and sold in the marketplace.  There is not a marketplace for buying and selling unique formations in their natural settings on public lands.  Under the majority's rationale, presumably the formations in what became Arches National Park

---

1/  Finding the claims were properly located under the Building Stone Act, the majority also vacates Judge Child's holding that the lands are more valuable for purposes other than mining under the 1872 General Mining Law, 30 U.S.C. § 22 (1994).  The majority thus avoids BLM's suggestion that we reconsider our decisions stating there is no comparative values test under the General Mining Law.

142 IBLA 379

could have been sold for building stone unless enough people had paid to go and see them where they are.

Fortunately, the Big Wood River channel can still be protected. The Department could compensate United Mining Corporation for its claims and recommend the area be withdrawn. 43 U.S.C. § 1714 (1994). Or, based on the scientific interest of the area, the President could declare it a national monument. 16 U.S.C. § 431 (1994). Either would preserve for future enjoyment and study the integrity of a special place formed at least 7,000 years ago.

But these measures would not have been necessary. The language of the Building Stone Act of 1892 is that "[a]ny person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims." Nothing in this language precludes taking aesthetic and geological values into account when determining whether the lands are chiefly valuable for building stone. The "chiefly valuable" language of the Building Stone Act derived from the "valuable chiefly for timber [or stone], but unfit for cultivation" language of the much-abused Timber and Stone Act of 1878. 2/ But the historical origin of this language likewise does not preclude present-day consideration of whether lands unfit for cultivation are more valuable for building stone or for other purposes. In United States v. Meluzzo, 76 Interior Dec. 181, 188-89 (1969), the

_____

2/  Sec. 1, Act of June 3, 1878, Ch. 151, 20 Stat. 89.  See Gates, History of Public Land Law Development, U.S. Government Printing Office, Washington, DC, 1968, at 470, 485, 550-52.

IBLA 95-133

Department held claims under the Building Stone Act invalid because the lands were more valuable for nonmining (in that case, residential) purposes.

When it has been possible to compare quantified values of the lands for building stone with quantified values for other uses, we have done so. U.S. v. Chartrand, 11 IBLA 194, 220-221, 80 Interior Dec. 408, 421-22 (1973); United States v. Meluzzo, supra, at 186-87. But those decisions do not mean we cannot or should not make a judgment when it is more difficult to compare the value of mining the land for building stone with the value of the land for other purposes, especially in a case such as this when the record strongly supports the existence of extraordinary aesthetic and geologic values. Making judgments under the Building Stone Act about whether less quantifiable values would properly outweigh the value of lands for building stone would not differ from the kind of judgments we make when reviewing BLM determinations in other contexts involving "subjective" values, e.g., whether an area is properly designated as wilderness.

In A Lost Lady Willa Cather wrote of the loss of vision in the depression era when the Building Stone Act was passed:

> By draining the marsh Ivy had obliterated a few acres * * * and had asserted his power over the people who had loved those unproductive meadows for their idleness and silvery beauty * * *. All the way from the Missouri to the mountains this generation of shrewd young men, trained to petty economies by hard times, would do exactly what Ivy Peters had done when he drained the Forrester marsh. [3/]

Removing the boulders from the Big Wood River channel would be like draining the Forrester marsh. Petty economies.

_____
3/   Cather, A Lost Lady, Alfred A. Knopf, New York, New York, 1923, at 89-90.

142 IBLA 381

IBLA 95-133

In my view, we should conserve such an unusual example of the forces that created our tiny place in the universe. Thomas Fairchild Sherman has written:

> The land—its rocks and waters, people, plants, and animals—
> are joined in a continually unfolding pageant through time. The
> scenes are changed by forces as tangible and immense as those
> that tore Pangaea asunder, or by energies as subtle and myster-
> ious as the migration of butterflies or the passions of human
> adventure. We participate in only a few moments of the pageant,
> yet each moment has the whole eternity within it. If we see the
> eternal, we will honor the moment and cherish the earth and all
> its wildernesses of life. [4/]

I dissent.

Will A. Irwin
Administrative Judge

I concur:

Gail M. Frazier
Administrative Judge

_____

4/  Sherman, A Place on the Glacial Till, Oxford University Press,
New York, New York, 1997, at 176-77.

142 IBLA 382

ADMINISTRATIVE JUDGE ARNESS DISSENTING:

The lead opinion concludes that a consideration of the statutory
phrase "chiefly valuable," appearing in the Building Stone Act, is limited
to a choice between whether land is valuable for mining or agriculture, and
finds that geologic uniqueness cannot be a measure of both validity and
invalidity under the Act.  The concurring opinion attempts to lend credence
to those conclusions by refining the lead opinion's references to historic
justification.  I disagree with both of those opinions.

Judge Child found as a fact that "Holystone," the material claimed by
Appellant, was located for and can be used as building stone, but that the
claimed land is more valuable for aesthetic and geologic purposes than for
either building stone or other mining purposes.  (Decision at 12.)  Apply-
ing the Building Stone Act, he then concluded that the mining claims at
issue are valuable for building stone, but that the evidence does not sup-
port a conclusion that the land in question is chiefly valuable therefor.
Id.

The Building Stone Act provides, pertinently:  "Any person authorized
to enter lands under the mining laws of the United States may enter lands
that are chiefly valuable for building stone under the provisions of the
law in relation to placer mining claims."

The words "chiefly valuable" plainly require that there be a com-
parison of competing values, if there are any, to determine whether Appel-
lant's mining claims are valid under the Building Stone Act.  The lead and
concurring opinions assume this inquiry is qualified by an historic under-
standing that the Department, when determining whether lands are "chiefly

142 IBLA 383

valuable for building stone," must make a market analysis comparison
between competing agricultural and mining uses. There is, however, no
language in the statute to limit the Department in this way, nor has the
Department promulgated regulations to this effect. Neither opinion cites
any legislative history indicating that Congress intended the language to
be so limited. "[T]he meaning of * * * [a] statute must, in the first
instance, be sought in the language in which the act is framed, and if that
is plain, * * * the sole function of the courts is to enforce it according
to its terms." Caminetti v. United States, 242 U.S. 470, 485 (1916). I
find no ambiguity in the statute to justify an attempt to read the plain
meaning out of the statutory words "chiefly valuable." I agree with Judge
Child that an analysis of the evidence produced at hearing shows that
Appellant's claims are null and void because Appellant failed to make the
showing required by the 1892 Building Stone Act that they were chiefly
valuable for mining.

In the course of offering evidence to make a prima facie case that
Appellant's mining claims were invalid, the Bureau of Land Management (BLM)
established that the contested lands are geologically unique and that their
disturbance by mining will constitute the destruction of a natural wonder
unlike any other in the world. This sweeping statement of fact is based
upon the expert opinion of two of BLM's staff geologists; it has not been
challenged by Appellant, who characterizes the Holystone material as "geo-
logical diamonds," (Tr. at 267), and agrees the material is unique. While
Appellant presented some evidence concerning commercial value, no attempt

142 IBLA 384

IBLA 95-133

was made to deprecate the showing made by BLM concerning the value of con-
serving the resource. Appellant's witnesses limited their testimony to a
showing of commercial values as evidenced by actual sales (a point conceded
by BLM), and did not attempt to show their claim was superior, in any way,
to the public interest in preserving the stream bed in its present condi-
tion. On the record presented to us, we must therefore accept the testi-
mony of BLM's experts as a valid statement of resource conditions on the
claims.

The error inherent in the reasoning pursued by the lead (and concur-
ring) opinion on this point is revealed by the conclusion that "geologic
uniqueness" may not render a claim for building stone invalid because it
is precisely the same "geologic uniqueness" that defines building stone as
a locatable mineral. Nothing, in this view, can ever compare to an inter-
est arising under the Mining Law unless it can be shown to produce a bet-
ter commercial profit margin. This approach is not, however, a reasoned
response to the statutory requirement that a claimant prove his claims are
chiefly valuable for building stone. It is rather an attempt to substitute
the "marketability test" originated in United States v. Coleman, 390 U.S.
599, 603 (1968), for the statutory requirement that a building stone claim-
ant show his claims are "chiefly valuable" for that material.

When there is no ambiguity in the wording of a statute, it may not
be varied simply because someone may for other reasons appear to deserve
relief. Hamilton Brothers Oil Co., 123 IBLA 229, 232 (1992); and see U.S.
v. Locke, 471 U.S. 84, 109 (1984). What the lead and concurring opinions

142 IBLA 385

IBLA 95-133

do, in order to avoid making the comparison of competing interests required by the Building Stone Act, is to impose a marketability test on the Department while at the same time shifting the burden of persuasion from Appellant to the Government.  This approach is inconsistent with the statute and with unbroken prior Departmental practice; to pursue it is error.

Accordingly, I dissent; because Appellant did not sustain the burden of persuasion by showing that the claims at issue are chiefly valuable for building stone, I would affirm Judge Child's Decision.

Franklin D. Arness
Administrative Judge

I concur:

John H. Kelly
Administrative Judge

142 IBLA 386